**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VICTOR MOSS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 18-1262 |
| | : | |
| NATIONAL RAILROAD PASSENGERS | : | |
| CORPORATION, individually, and doing | : | |
| business as AMTRAK, ANDREW KEEFE, | : | |
| individually, and JOHN PIELLI, individually, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                    **SEPTEMBER  26, 2019**

Presently before this Court is the Motion for Summary Judgment filed by Defendants,

National Railroad Passengers Corporation, doing business as Amtrak ("Amtrak"), Andrew Keefe

("Keefe") and John Pielli ("Pielli") (collectively "Defendants"), Plaintiff, Victor Moss' ("Moss")

Response in Opposition to Defendants' Motion for Summary Judgment, and Defendants' Reply.

For the reasons that follow, Defendants' Motion for Summary Judgment will be granted.

## I.     BACKGROUND[1]

### A.     FACTUAL HISTORY

---

[1]Defendants filed a "Statement of Undisputed Material Facts" ("SOF").  (*See* Doc. No. 20-2.)  Moss filed a "Counter 56.1 Statement to the 56.1 Statement of Defendants" ("CSOF").  (*See* Doc. No. 23-18.)  Moss' CSOF responds with an admission or denial of each of the facts set forth by Defendants.  (*See id.*)  Moss admits a majority of the factual assertions set forth by Defendants.  (*See id.*)  Many times, even when agreeing or disagreeing with Defendants, Moss adds further facts.  (*See id.*)  Unless otherwise noted, we reference facts which Moss does not dispute.  To the extent that there is a dispute, we have included Moss' additional facts.  Also, in light of the extensive amount of facts, we have cited only to the paragraphs used in the SOF and CSOF, which explicitly cite to the record.  We rely upon the parties' citations to the record, and, in an effort to save space, we have not included the citations to the record here.

### 1.    *Moss Joins Amtrak and is Promoted Several Times*

Moss (African American) began working for Amtrak in June of 2011 as a Manager of Field Operations System in the Engineering Department in Philadelphia.  (SOF ¶ 1.)  Andrew Keefe ("Keefe") (Caucasian) hired Moss for the position.  (SOF ¶ 2.)  In January 2014, Moss was granted a transfer to the position of Engineer Track Specialist Mid-Atlantic Division in Philadelphia.  (SOF ¶ 3.)  Later that same year, Moss applied, and was selected, for a promotion to the position of Assistant Production Engineer in Philadelphia, effective August 22, 2014.  (SOF ¶ 4.)  Moss held that position from August 22, 2014 until May 2015.  (SOF ¶ 5.)

In or around May 2015, Moss applied, and was selected, for a promotion to the position of Program Manager III in Philadelphia, with an effective start date of May 18, 2015.  (SOF ¶ 6.) Keefe, who had assumed the role of Deputy Chief Engineer of Amtrak's Engineering Department around the same time, was now responsible for approving promotion selections within the department.  (SOF ¶¶ 7-8.)  Keefe approved Moss' promotion to the Program Manager III position.  (SOF ¶ 9.)  As a Program Manager III, Moss initially reported to Mitchell Moore ("Moore") (African American), who reported to Keefe.  (SOF ¶ 10.)

### 2.    *Moss Applies to the Senior Manager Engineering Production Position for the First Time*

In September 2015, Moss applied for the position of Senior Manager Engineering Production (the "Senior Manager position").[2]  (SOF ¶ 11.)  Moore, who was Moss' direct supervisor at the time, interviewed Moss and another candidate, Michael Albanese ("Albanese") (Caucasian), for the position.  (SOF ¶¶ 10, 12-13.)  Moore selected Albanese for the position. (SOF ¶ 14.)  Moss does not believe that Moore's selection decision was discriminatory, and does

---

[2]Moss adds that the Senior Manager position was a New York position, not a Philadelphia position.  (CSOF ¶ 11.)

not question that Albanese was qualified for the position.  (SOF ¶ 15; CSOF ¶ 15.)  Albanese ultimately declined the position and the position remained unfilled.  (SOF ¶¶ 16-17.)

### 3. Moss Applies to the Senior Manager Position a Second Time

In April 2016, Amtrak reposted the Senior Manager position, and Moss applied for a second time.  (SOF ¶¶ 11, 18-19.)  Moore interviewed Moss and two other candidates - James Miller (Caucasian) and Michael Thomas (Caucasian).  (SOF ¶ 20.)  This time, Moore selected Moss for the position.  (SOF ¶ 21.)  However, as Deputy Chief Engineer, Keefe was responsible for approving Moore's selection, and he chose not to approve the selection.  (SOF ¶¶ 22-23.)

Keefe did not approve Moore's selection of Moss for two reasons.  (SOF ¶ 24.)  First, Keefe did not believe, based on his experience working with Moss, that Moss was ready for the level of responsibility the position entailed.  (SOF ¶ 25.)  Specifically, the Senior Manager would be required to manage half of the engineering production organization, and Keefe had concerns about Moss' ability to manage at a higher level given that Moss' experience as a Program Manager III was focused on managing multiple small gangs.  (SOF ¶ 26.)  Second, the Engineering Department was in the process of being reorganized and Keefe believed that John Pielli ("Pielli") (Caucasian) should participate in the interviews given that the person selected for the Senior Manager position would, as a result of the reorganization, report directly to him instead of Moore.  (SOF ¶ 27.)  When Keefe made the decision to deny Moore's selection of Moss, he knew that, as a result of the restructuring, Moore would no longer be supervising the Senior Manager position.  (SOF ¶ 28.)  It is common practice for Amtrak to restart the job posting and selection process for a position if, for example, a new selecting manager becomes involved.  (SOF ¶ 29.)

Moss states that the reasons provided by Keefe do not match the evidence in this case. (CSOF ¶¶ 24, 27, 28.) Specifically, the reorganization by Amtrak has been going on since 2015, both Moore and Pielli were fully aware of the reorganization, and conducted the interviews regardless. (CSOF ¶¶ 24, 27, 28.) Pielli explicitly acknowledged that "there was always a potential for the department to be united. That was the concept in relationship I had with Mitch [Moore], is that *we were interviewing candidates that could potentially work for either he, I or another leader as a united production crew in the future*." (CSOF ¶ 24.) (citing Ex. 3, 53:22-54:2, 68:8-11). Moss goes on to state that he was qualified for the position based on his experience working under and with Moore. (CSOF ¶ 24, 27, 28) (citing Ex. 6, 16:17-22, 17:20-14).

Moss also asserts that he served as a second hand for Moore, taking care of the track usage and coordinating Moore's gangs. (CSOF ¶¶ 25, 26) (citing Ex. 6, 15:1-16:3). He states that he would help in all phases of the "24/7 operation," coordinating with night shifts, setting up calls at the outset of their shift at 8:00 p.m. and checking in with them first thing the following morning. (CSOF ¶¶ 25, 26) Moss directly managed a crew of his own equating to an estimated 150 people. (CSOF ¶¶ 25, 26) (citing Ex. 6, 16:6-10). In addition to his own crew, Moss helped support and manage two-thirds of Moore's staff of nearly 1,000 people and assisted on his large-scale projects. (CSOF ¶¶ 25, 26) (citing Ex. 6, 16:20-17:24). According to Terry Tiller (Caucasian), who was hired as Senior Manager, he stated that he only manages an estimated 320 employees and worked on a large budget project estimated to be valued around one hundred million dollars. (CSOF ¶¶ 25, 26) (citing Ex. 7, 28:8-19).

After denying Moore's selection, Keefe placed the Senior Manager position on hold. (SOF ¶ 31.) Amtrak never made Moss, who was unaware of the restructuring that was taking place at this time, an offer for the Senior Manager position. (SOF ¶¶ 30, 32.)

### 4. Amtrak's Reorganization of the Engineering Department and its Impact on the Senior Manager Position

When Moss interviewed for the Senior Manager position for the second time, Amtrak had started to reorganize its Engineering Department. (SOF ¶ 33.) Moss argues that the reorganization by Amtrak has been ongoing since 2015, and Moore and Pielli were fully aware of the reorganization and conducted interviews. (CSOF ¶ 33) (citing Ex. 3, 53:22-54:2, 68:8-11). Moss also states that he was qualified for the Senior Manager position based on his work with Moore. (CSOF ¶ 33) (citing Ex. 6, 16:17-22, 17:20-14). According to Amtrak, the reorganization, which took place over the course of many months and involved personnel changes in 2016 and 2017, involved splitting the Mid-Atlantic Division into two regions (north and south) to better accommodate its increasing workload. (SOF ¶¶ 34-35.) Moss, again, argues that the reorganization project was well underway as early as the beginning of 2015. (CSOF ¶ 35) (citing Ex. 6, 18:14-20:4). Amtrak argues that Moss had no knowledge about the reorganization. (SOF ¶ 36.) As part of the reorganization, Keefe asked Moore to take on a role in the new Mid-Atlantic South Region, which was based in Baltimore. (SOF ¶ 37.) Moore accepted the position because he was from Baltimore and felt it would be a "good fit." (SOF ¶ 37.) Meanwhile, Pielli assumed the role of Director of Engineering Production in Philadelphia, *i.e.*, the Mid-Atlantic North Region. (SOF ¶ 38.)

The roles of Pielli and Moore in Philadelphia overlapped for a period in 2016, with each taking responsibility for different aspects of the work, until Moore moved to his new position in Baltimore. (SOF ¶ 39.) During the period of overlap, Moore and Pielli each took part in hiring

for vacant positions in the Mid-Atlantic Engineering Department; however, Pielli was not involved in the April 2016 interviews for the Senior Manager position, including Moss' interview for the position. (SOF ¶ 40.) Moore did not consult with Pielli regarding his selection of Moss for the Senior Manager position in April 2016, because, at the time, Moore was unaware of any plan for Pielli and Moore to split the Mid-Atlantic Region. (SOF ¶ 41.)

Moss argues that, during the reorganization, it is agreed by nearly all witnesses that Pielli and Moore, in fact, worked together, restructuring and hiring within the department. (CSOF ¶ 40) (citing Ex. 5, 12:16-13:6; Ex. 2, 18:7-25; Ex. 6, 24:4-19). Pielli himself even acknowledged that he and Moore shared the responsibility in 2016 of interviewing 17 positions, specifically stating that they interviewed every position together except where a scheduling conflict arose. (CSOF ¶ 40) (citing Ex. 3, 47:5-48:8).

Moore transferred to the new Mid-Atlantic South Region in Baltimore in September of 2016. (SOF ¶ 42.) After Moore assumed his new role in Baltimore, Pielli focused on expanding the Mid-Atlantic North Region in Philadelphia to cover signal, electric traction, and track production. (SOF ¶ 43.) With respect to the Senior Manager position, Pielli testified that he already had a track expert and a transportation expert, and was interested in adding someone with expertise in interlocking, signal, and electric traction experience to "match and realistically function with" additional "capital drive and duties." (SOF ¶ 44.) Additionally, Keefe testified that, although the Senior Manager position, at the time, involved approximately fifty percent track work, twenty-five percent structures and bridges, and twenty-five percent communications and signals, Amtrak was "taking on a lot more state-funded projects involving relocations of interlockings, which require design of signals and construction of signals." (SOF ¶ 45.)

According to Moss, Tiller explained that it was only after the reorganization, when he became a Director, only then did he take on responsibilities related to signal construction. (CSOF ¶¶ 43, 44, 45) (citing Ex. 7, 32:15-22). This was corroborated by Moore who expressly recalled the position requirements not changing until 2018. (CSOF ¶¶ 43, 44, 45) (citing Ex. 2, 58:5-8). The posting clearly states throughout that the position requires a high level of construction knowledge and was focused on "long-term programs for capital and maintenance track construction projects." (CSOF ¶ 44) (citing Ex. 12). Moore stated that the position would entail an estimated 90 percent of track work. (CSOF ¶ 44) (citing Ex. 2, 66:6-9). Keefe even stated that the position consists of "probably 25 percent communications and signals." (CSOF ¶ 44) (citing Ex. 2, 40:18-41:2). When questioned about the lack of Signals/Communications requirements on the posting itself, Pielli stated, "It wasn't necessary." (CSOF ¶ 44) (citing Ex. 4, 120-122).

### 5. *Moss Applies for the Senior Manager Position for a Third Time*

In October of 2016, Keefe instructed Talent Acquisition Supervisor Lisa Williams ("Williams") (African American) to work with Pielli to fill the Senior Manager position. (SOF ¶ 46.) Pielli asked Williams to repost the position, which she did on October 7, 2016. (SOF ¶ 47.) Around this time, Moss approached Pielli and asked to be placed in the Senior Manager position that he had previously interviewed for with Moore in April 2016. (SOF ¶ 48.) Pielli told Moss he would not hire someone who he had not personally interviewed. (SOF ¶ 49.) Moss believed Pielli's explanation. (SOF ¶ 50.) Moss adds that he believed that Pielli discriminated against him by failing to promote him. (CSOF ¶ 50.) (citing Ex. 1, 71:13-72:20).

Moss applied for the Senior Manager position a third time, and Pielli selected him for an interview.[3] (SOF ¶¶ 51-52.) Tiller, Raymond Maine ("Maine") (Caucasian), Kristin Leese ("Leese") (Caucasian), and Frank Kruse ("Kruse") (Caucasian) also applied and were selected to interview for the position. (SOF ¶ 53.) On December 13, 2016, Pielli, LaTonya Barber ("Barber") (Analyst - African American), and James Savarese ("Savarese") (Director, Program Management – Caucasian) (collectively the "Panel") interviewed the selected candidates for the position. (SOF ¶ 54.) As part of the Panel, Savarese and Barber assisted Pielli in asking questions and taking interview notes. (SOF ¶ 55.) However, in her role as an Analyst, Barber had no technical expertise in engineering and, therefore, did not participate in the decision. (SOF ¶ 56.) Contrarily, Savarese had a technical background and served as a "cross check" for Pielli by making suggestions to Pielli as to who he believed was the best candidate. (SOF ¶ 56.)

In his interview notes, Pielli wrote that Moss needed "more experience with Big Units" and noted that Moss discussed his experience with projects and "single problems" despite that he was asked about his experience with programs. (SOF ¶ 57.) Savarese wrote in his interview notes that Moss had "never managed TLS [track laying system] or C&S [communications and signals] or structures," did not seem to "understand the distinction of a program versus a project" when asked about his experience with programs, and did not respond well to questions about delegation and leadership. (SOF ¶ 58.)

Tiller, however, had 36 years of experience, including 12-14 years of experience with Amtrak's switch exchange/interlocking system, which provided him with experience in track, signal and electric traction systems, and he had managed large construction projects, including projects with budgets over $100 million. (SOF ¶ 59.) Tiller had another five years of track

---

[3]Moss adds that the position in September 2015 was, in fact, a New York position, not a Philadelphia position. (CSOF ¶ 51) (citing Ex. 16).

experience – in addition to the years he spent working on the switch exchange system – from his work in the Mid-Atlantic Division maintaining and testing infrastructure and, at the time of his interview, maintained an "MW 1000" qualification in track standards.  (SOF ¶ 60.)

The Panel recommended Tiller for the position and provided the following "Selection Justification":[4]

> Terry Tiller has extensive experience (30 Years) working within NEC Railroad Operations.  His previous positions include signal-design, construction, training & maintenance.  He has worked with or directly managed a population at time of approx. 190 employees consisting of Managers, Sr. Engineers, Supervisors and BRS force accts.  His duties interface with all other production teams and [he] is very familiar with all phases of work done in Production.  His management, budgeting and field experience makes him the best candidate for this position.

(SOF ¶ 61.)

Keefe approved the Panel's selection of Tiller.  (SOF ¶ 62.)  Keefe explained that he approved the Panel's selection because Tiller was "heavily experienced in communications and signals with an understanding of working in conjunction with track and structures," which was useful given that the Senior Manager position oversees the signal construction organization.  (SOF ¶ 63.)  Further, Keefe was familiar with Tiller's prior management performance and knew him to have "delivered at a high level for many years."  (SOF ¶ 63.)  As a result, in January 2017, Tiller was hired for the Senior Manager position.  (SOF ¶ 64.)  Moss remained in the position of Program Manager III, and reported to Pielli.  (SOF ¶ 65.)

Moss adds that Barber and Pielli assert that Barber was given the opportunity to provide feedback as to the candidates.  (CSOF ¶ 56) (citing Ex. 5, 32:11-20, Ex. 4,  150:14-25).  The only difference in their recollection of the candidate discussion was that Barber has consistently

---

[4]Amtrak states that "Ms. Barber was not a decision-maker; however, she agrees that Mr. Tiller was qualified for the position."  (SOF ¶ 61 n.1).

held that she stated Moss was the most qualified candidate, a fact she reiterated during Amtrak's Equal Employment Opportunity ("EEO") Compliance Office Investigation. (CSOF ¶¶ 56, 61, 62) (citing Ex. 5, 33:5-6, 38:24-39:8; Ex. 11). Moss further adds that he helped support and manage two-thirds of Moore's staff of nearly 1,000 people and assisted on his large-scale projects. (CSOF ¶¶ 57, 58) (citing Ex. 6, p. 16:20-17:24). Moss also reiterates that Tiller explained that it was only after the reorganization, when he became a Director, that he took on responsibilities related to signal construction, which was corroborated by Moore who expressly recalled the position requirements not changing until 2018. (CSOF ¶ 63) (citing Ex. 7, 32:15-22; Ex. 2, 58:5-8). The posting clearly states that the position requires a high level of construction knowledge and was focused on "long-term programs for capital and maintenance track construction projects." (CSOF ¶ 63) (citing Ex. 12). Moore stated that the position would entail an estimated 90 percent of track work, and Keefe even stated that the position would consist of "probably 25 percent communications and signals." (CSOF ¶ 63) (citing Ex. 2, 66:6-9; Ex. 2, 40:18-41:2). When questioned about the lack of Signals/Communications requirements on the posting itself, Pielli stated "It wasn't necessary." (CSOF ¶ 63) (citing Ex. 4, 120-122).

### 6. *Moss Files an Internal Complaint of Discrimination and Amtrak Conducts an Investigation*

According to Moss, the first time that any of the Defendants discriminated against him because of his race was when he was selected by Moore for the Senior Manager position in April 2016, but was not actually put into the position. (SOF ¶ 66.) Moss registered a complaint of discrimination to Amtrak on October 23, 2016, after he learned earlier that month that Keefe had put the Senior Manager position on hold back in April 2016. (SOF ¶ 67.)

On October 23, 2016, prior to interviewing for the position for a third time, Moss sent an email to Rodrigo Bitar ("Bitar") (Assistant Vice President of Engineering), with a carbon copy to

Keefe, Pielli, and Moore, regarding his application to the Senior Manager position. (SOF ¶ 68.) In his email, Moss expressed concern that he applied and was selected for the Senior Manager position in April 2016 (*i.e.*, his second application), but had not yet been placed in the position. (SOF ¶ 69.) Moss further stated he felt that black managers are subject to a different hiring process than white managers. (SOF ¶ 70.)

Moss testified that the black managers who he believed were subjected to a different hiring process in the Engineering Department were himself and Moore. (SOF ¶ 71.) Moss believed that Moore was subjected to a different hiring process because Moore was selected for a promotion, but was not placed in that role until several months later. (SOF ¶ 72.) However, Moss does not know when Moore interviewed for the position he believed was delayed, who interviewed him, who the decision-maker was, how long it took for Moore to be awarded the position, or who else interviewed for the position. (SOF ¶ 73.) Nor did Moss ever ask anyone at Amtrak about the reason for the perceived delay in Moore's promotion. (SOF ¶ 73.) When questioned about why he believed the delay was because of Moore's race, Moss testified, "I have no other reason from what I can see. That's what was visible to me. I don't know of anything else. It's just the fact that it happened to me and it happened to him. That's the reason I got the view of it." (SOF ¶ 74) (citing Ex. A, Dep. of Moss, 135:24-136:8). Moss adds that Moore himself testified that he believes Keefe to be racist, he further discusses a delay in his own hiring process wherein Keefe ultimately approved his promotion after nearly four months. (CSOF ¶¶ 73, 74) (citing Ex. 52:13-43:24).

Keefe responded to Moss' October 23, 2016 email and stated that Moss' allegation of differential treatment was unfounded and that the delay in filling the Senior Manager position was due to the restructuring of the Mid-Atlantic Division. (SOF ¶ 75.) Moss' email was

forwarded to Amtrak's EEO Office, and EEO Compliance Analyst Laura Strashny ("Strashny") was assigned to investigate Moss' complaint. (SOF ¶ 76.) Pursuant to the investigation plan that Strashny drafted, she anticipated that her investigation of Moss' complaint would take approximately two months - from November 2016 until January 2017 - to complete. (SOF ¶ 77.)

Strashny spoke with Moss at least twice as part of her investigation. (SOF ¶ 78.) For a failure to promote claim like Moss' complaint, Strashny would also generally interview the people that were involved in the selection or promotion decision. (SOF ¶ 79.) Accordingly, by the end of January 2017, Strashny interviewed (1) Moore and Williams, both of whom participated in Moss' interview for the Senior Manager position in April 2016; (2) Pielli, Savarese, and Barber, all of whom participated in Moss' interview for the Senior Manager position in December 2016; and (3) Keefe, as he was responsible for approving the selection decision in April 2016 and December 2016. (SOF ¶¶ 80-82.)

During Pielli's interview with Strashny, Pielli explained that he chose to conduct his own interview process rather than accept Moore's selection of Moss because he would not promote anyone he had not personally interviewed. (SOF ¶ 83.) As to why he selected Tiller over Moss in December 2016, Pielli told Strashny that Tiller was the best candidate because a "track expert" named Ralph Smith ("Smith") had already been hired to fill the Senior Manager position in New York, and Tiller had "more of a program work background: design, maintenance, construction – system wide." (SOF ¶ 84.) Moss, in contrast, was more of a "single project manager" who "did not have a program background of design, maintenance, construction and planning." (SOF ¶ 84.)

During Savarese's interview with Strashny, Savarese explained that Tiller was his first choice among the candidates interviewed, and Leese was his second choice. (SOF ¶ 85.) Savarese believed that "Mr. Tiller's programmatic experience was superior to the other

candidates," that he understood the difference between managing at a program versus a project level, and had experience with "large dollar value" programs and working with executive management, which would be "an integral part of his position." (SOF ¶ 86.) Savarese's impression of Moss was that "[t]he majority of his answers missed the mark," that "[h]e couldn't explain the difference between project and program management," and that, with respect to delegating authority, "he indicated he would do most of it himself." (SOF ¶ 87.)

Barber confirmed during her interview with Strashny that the selection process for the Senior Manager position had been restarted again in October 2016 because of the change in managers, *i.e.*, from Moore to Pielli. (SOF ¶ 88.) Barber explained that she did not know the basis for the selection by Pielli and Savarese because she was not a decision-maker. (SOF ¶ 89.) Moss adds that Barber and Pielli assert that Barber was given the opportunity to provide feedback as to the candidates. (CSOF ¶ 89) (citing Ex. 5, 32:11-20, Ex. 4, 150:14-25). The only difference in their recollection of the candidate discussion was that Barber has consistently held that she stated that Moss was the most qualified candidate, a fact she reiterated during Amtrak's EEO Investigation. (CSOF ¶ 89) (citing Ex. 5, 33:5-6, 38:24-39:8; Ex. 11).

During Keefe's interview with Strashny, Keefe explained that he put a hold on the Senior Manager position in April 2016 because he "thought it was important for John Pielli to be a part of the selection panel" given that the person who got the position would report to Pielli after the reorganization. (SOF ¶ 90.) Keefe further explained that he put a hold on the position because Moss' performance was not yet where it needed to be for the level of responsibility the Senior Manager position involved. (SOF ¶ 90.) While Keefe felt that Moss was an "average manager," he did not believe Moss' productivity was where it needed to be. (SOF ¶ 90.)

Moss asserts that Pielli was fully able to be a part of the April 2016 candidate review, but willingly disregarded all emails relating to the candidates. (CSOF ¶ 90) (citing Ex. 9; Ex. 3, 36:21-37:5; Ex. 5, 19:7-22). Pielli explicitly acknowledged that "there was always a potential for the department to be united. That was the concept in relationship I had with Mitch [Moore], is that *we were interviewing candidates that could potentially work for either he, I or another leader as a united production crew in the future*." (CSOF ¶ 90) (citing Ex. 3, 53:22-54:2, 68:8-11). Moss served as a second hand for Moore, taking care of the track usage and coordinating Moore's gangs. (CSOF ¶ 90) (citing Ex. 6, 15:1-16:3). Moss would help in all phases of the "24/7 operation," coordinating with night shifts, setting up calls at the outset of their shift at 8:00 p.m. and checking in with them first thing the following morning. (CSOF ¶ 90.) Moss directly managed a crew of his own equating to an estimated 150 people. (CSOF ¶ 90) (citing Ex. 6, 16:6-10). In addition to his own crew, Moss helped support and manage two-thirds of Moore's staff of nearly 1,000 people and assisted on his large-scale projects. (CSOF ¶ 90) (citing Ex. 6, 16:20-17:24).

Defendants state that Keefe told Strashny that he had denied other promotion recommendations, including those of white employees, based on his knowledge of their performance. (SOF ¶ 91.) For example, Keefe represented that he previously denied Moore's selection of a Caucasian employee for promotion to a different role, and only ultimately approved of the selection after further discussions with Moore. (SOF ¶ 92.) As to why he approved Tiller for the Senior Manager position, Keefe told Strashny that the Senior Manager position oversees signal construction organization and that Tiller had more communication and signals experience. (SOF ¶ 93.) Moss asserts that Tiller explained that it was only after the reorganization, when he became a Director, that he took on responsibilities related to signal

construction. (CSOF ¶ 93) (citing Ex. 7, 32:15-22). This was corroborated by Moore who expressly recalled the position requirements not changing until 2018. (CSOF ¶ 93) (citing Ex. 2, 58:5-8).

During his interview with Strashny, Moore confirmed that Keefe told him he put a hold on the Senior Manager position after Moss was selected by Moore because the Mid-Atlantic Division was being restructured. (SOF ¶ 94.) As to Moss' allegation that Moore's promotions were held up because of his race, Moore explained to Strashny that his promotion to Director in 2015 was delayed for a few months for an unknown reason that he could not attribute to race, but that he was promoted after Keefe became his supervisor, and that there was no delay in his promotion to Division Engineer in 2016. (SOF ¶ 95.) Moss adds that, not only does Moore unequivocally state that he believes Keefe to be racist, but he further discusses a delay in his own hiring process wherein Keefe ultimately approved his promotion after nearly four months. (CSOF ¶ 95) (citing Ex. 52:13-43:24).

By letter dated January 31, 2017, Strashny notified Moss that her investigation had not uncovered evidence to support his claim of discrimination, but invited him to submit any additional information that he believed might be relevant. (SOF ¶ 96.) Moss did not submit any additional information to Amtrak after receiving Strashny's letter. (SOF ¶ 97.) Other than his October 23, 2016 email and conversations with Strashny, Moss never made any other complaints to Strashny. (SOF ¶ 98.)

### 7. *Moss' Allegations of Retaliation Against Pielli*

After not receiving the Senior Manager position in December 2016, Moss remained working as a Program Manager III, reporting to Pielli. (SOF ¶ 99.) Moss believes that Pielli retaliated against him for complaining of discrimination in his October 23, 2016 email

to Bitar by:

    a.   assigning Moss to temporarily work night shift;

    b.   placing Moss on medical leave without his permission;

    c.   denying some of Moss' "travel expenses;" and

    d.   reassigning employees under Moss' supervision to other managers in January or February 2017.

(SOF ¶ 100.)  Moss also contends that Keefe retaliated against him by not acting to help him. (SOF ¶ 101.)  He does not allege, however, that Keefe engaged in any retaliatory acts.  (SOF ¶ 101.)

    *a.*    *Moss Is Assigned To Briefly Work The Night Shift*

While working as a Program Manager III, most of the crews reporting to Moss worked the midnight shift from 8:00 p.m. to 6:00 a.m.  (SOF ¶ 102.)  Although Moss testified that his "main  shift" was the day shift, he set his own schedule, "worked any hours he saw necessary," and "was constantly working with [his] people on the night shift" so that he could see their work and ensure their safety.  (SOF ¶ 103.)  Indeed, all managers leading production teams at Amtrak, like Moss, "are tasked to work . . . daylight, nights, weekends" to coordinate work that goes on "24 hours a day, seven days a week."  (SOF ¶ 104.)  Moss adds that he oversaw the work for many teams that worked by night and day shifts.  (CSOF ¶ 103) (citing Ex. 8, ¶ 38).

On January 11, 2017, Moss attended a meeting along with other managers, including Pielli, Tiller, Smith, and Joseph Cavanaugh ("Cavanaugh").  (SOF ¶ 105.)  During the meeting, Moss testified that Pielli told Moss he needed to work the midnight shift so that he could work with the employees he supervises.  (SOF ¶ 106.)  Moss testified he worked midnight shifts for

approximately two weeks, at which point another manager, Smith, asked him to "make some adjustments to spend a little time with the manager during the day shift." (SOF ¶ 107.) A week later, Moss returned to working the day shift as he had previously. (SOF ¶ 108.)

Moss believes that the change to the midnight shift and back to the day shift was in retaliation for his October 23, 2016 complaint to Bitar. (SOF ¶ 109.) However, Moss believes his shift change was retaliatory because he can think of no other explanation. (SOF ¶ 110.) When asked why he believed the shift change was retaliatory, Moss testified "What else would it be? Ain't nobody that stupid." (SOF ¶ 110.) Moss testified that he believed Pielli's intent in switching his schedule and discussing it in front of other managers was to "embarrass" Moss. (SOF ¶ 113.) Pielli testified that other managers with night crews visited their crews on the night shift, and it did not work for Moss to always be in the office given that his crew worked at night. (SOF ¶ 111.)

Moss further adds that Pielli's actions in changing his shift were done to humiliate and degrade him. (CSOF ¶ 110) (citing Ex. 8, ¶¶ 35-40). Moss would help in all phases of the "24/7 operation," coordinating with night shifts, setting up calls at the outset of their shift at 8:00 p.m. and checking in with them first thing the following morning. (CSOF ¶ 111) (citing Ex. 6, 15:1-16:3).

### b. Moss Is Absent From Work For Several Days Without Notifying Management

During the January 11, 2017 meeting, Moss was "hot" and embarrassed that Pielli discussed his schedule change in front of the other managers, so he walked out of the meeting before it concluded. (SOF ¶ 112.) Moss adds that he was humiliated by Pielli in the meeting on January 11, 2017, and demeaned in front of his colleagues. (CSOF ¶ 112) (citing Ex. 8, ¶ 34). Later the same day, Moss sent Keefe an email stating "I have to get medical help for the stressful

conditions that I am dealing with in my place of employment.  I will keep you informed with proper documentation from my doctor." (SOF ¶ 114.)  After receiving Moss' email, Keefe spoke to the other managers who had attended the meeting, and they described it as professional.  (SOF ¶ 115.)

Moss did not communicate with Amtrak again about his leave until eight days later, on January 19, 2017.  (SOF ¶ 116.)  Moss' physician prepared a "Disability Certificate" stating that Moss had been incapacitated from January 12, 2017, to January 18, 2017.  (SOF ¶ 117.)  On January 18, 2017, before Moss communicated with anyone at Amtrak about when he would return to work, Pielli filled out a "Request for Leave of Absence" form in which he approved of Moss' taking Short Term Disability leave effective as of January 12, 2017.[5]  (SOF ¶ 118.)  However, on January 18, 2017, the same day that Pielli submitted the Request for Leave of Absence, he cancelled it as having been "submitted in error."  (SOF ¶ 119.)  Despite Pielli's attempt to cancel the leave request, it was processed and approved by Amtrak's Human Resources department.  (SOF ¶ 120.)  The cancellation was later recognized and Moss' pay was adjusted to correct it.  (SOF ¶ 121.)

Moss adds that Pielli cancelled his request despite Moss not indicating he would return until the next day. (CSOF ¶ 119.)  He also adds that Keefe himself stated that he did not believe he could ever apply for a medical on behalf of an employee, "unless the employee was incapacitated in some way or asked me to."  (CSOF ¶ 120) (citing Ex. 2, 62:15-25). The record is clear, Moss never asked Pielli to complete this form on his behalf.  (CSOF ¶ 120.)  When asked about completing leave paperwork on behalf of an employee, Moore explained that he has never

_____

[5]During Pielli's deposition, he alternatively used the terms "FMLA" (Family and Medical Leave Act), "short term sickness," "short term disability" and "short term medical" when describing the request for leave that he filled out. (SOF ¶ 118 n.2.)

completed a form on behalf of an employee, stating, "It's illegal." (CSOF ¶ 120) (citing Ex. 2, 74:1-3).

Nonetheless, Moss believes that Pielli actually requested that he be placed on a 1,000 hour leave pursuant to the FMLA and did so to harass him. (SOF ¶ 122.) Moss wanted to use his accrued sick and vacation time, and believes that he could not use FMLA leave while he still had "time on the books." (SOF ¶ 123.) However, Amtrak requires employees to use accrued sick and vacation time concurrently with their FMLA leave. (SOF ¶ 124.) Moss adds that he had no desire to take medical leave, at that time, regardless of its availability. (CSOF ¶ 123.)

On January 19, 2017, the day that he returned from medical leave, Moss sent an email to Bitar, Keefe, Pielli and Strashny claiming that the January 11, 2017 meeting he had walked out of was hostile and affected his health. (SOF ¶ 125.) Moss also complained that Pielli wanted him to attend a meeting in New York and, although Moss did not know what the meeting was about, he wanted to bring his attorney. (SOF ¶ 126.) Keefe and Bitar each responded that Moss could not bring an attorney to an internal company business meeting. (SOF ¶ 127.) However, Keefe suggested that Moss contact Julia Costello ("Costello") (Employee Relations) or Strashny to address his concerns, and also offered to meet with Moss himself. (SOF ¶ 128.) Moss states that he was humiliated by Pielli in the meeting on January 11, 2017, and demeaned in front of his colleagues. (CSOF ¶¶ 125, 126.)

Strashny spoke with Moss by phone on January 19th (the date of his email), and he advised her that he did not wish to add a complaint of harassment to his complaint of discrimination, which, at the time, she was still investigating. (SOF ¶ 129.) Strashny followed up by email to confirm Moss' decision. (SOF ¶ 130.) Moss did not contact Costello. (SOF

¶ 131.) Moss did meet, however, with Keefe on or about February 3, 2017. (SOF ¶ 132.) At that time, Keefe explained that Moss should, in the future, keep his supervisor advised regarding his absences and that he should communicate with the persons in attendance at a meeting if he leaves a meeting before it concludes. (SOF ¶ 132.) Moss signed a memorandum that Keefe provided to him detailing these issues. (SOF ¶ 132.)

Moss' physician ultimately opined that he might benefit from FMLA leave and, after that physician submitted a medical certification, Amtrak approved Moss' request for FMLA leave as of April 4, 2017. (SOF ¶ 133.)

        *c.*      *Amtrak's Expense Policy*

While working as a Program Manager III, Moss was based in Philadelphia. (SOF ¶ 134.) Moss lives closer to Baltimore than he does to Philadelphia, so he chose to stay in a motel in Philadelphia rather than relocate or commute home at the end of the day. (SOF ¶ 135.) Amtrak's Travel Policy and Reimbursable Business Travel Expenses policy states that its purpose is to reimburse employees for expenses they incur while traveling on business on Amtrak's behalf, and that a supervisor who approves expenses must ensure that "each [travel] Expense Report is linked to an approved Travel Authorization for overnight trips and trips with airfare." (SOF ¶ 136.) Moss adds that he has a history of requesting reimbursement on his travel expenses as he traveled from Baltimore to Philadelphia every week for work. (CSOF ¶ 135.)

Moss based his request for reimbursement on his belief that the Section 6.8.2 of the policy permitted him to seek reimbursement for "a motel as close to [his] headquarters as possible." (SOF ¶ 137.) However, Section 6.8.2 of the policy actually states that an employee should "use hotels in reasonable proximity to their temporary place of business." (SOF ¶ 138.) Moss told Pielli that Moore had been approving his "travel" expenses within Philadelphia, and

Moore confirmed that he had done so for hotels outside the city limits. (SOF ¶ 139.) Pielli checked with Amtrak's Human Resources department regarding how to interpret the policy, and was informed that it does not pay for expenses in this situation. (SOF ¶ 140.) Thus, Pielli denied Moss' "travel" expenses for November 2017, explaining that because Moss' job was based in Philadelphia, he was not "traveling on business" when he worked in Philadelphia, and, therefore, was not entitled to reimbursement for "travel" expenses in Philadelphia. (SOF ¶ 141.)

Moss adds that "Mr. Moore said, the policy was that employees who worked at Headquarters in Philadelphia would 'not stay within the city limits, a policy which Mr. Moos [sic] abided by (Ex. 2, 72:19-73:17). Mr. Pielli stated that '[m]y opinion, again, is that had been manipulated, particularly for Victor.'" (CSOF ¶ 137.) Moss argues that Pielli denied Moss' requests before he took any steps to determine whether the conduct was consistent with Amtrak policy.[6] (CSOF ¶¶ 140, 141.)

### d. Pielli Reorganizes Employees Under Moss' Supervision

Moss believes Pielli retaliated against him by shifting some of the employees under his supervision to work under other managers in or around January or February of 2017. (SOF ¶ 142.) Moss is aware that the moving of employees to different managers was part of a reorganization by Pielli, but he never asked Pielli to explain his reasoning. (SOF ¶ 143.) Moss does not know if employees who reported to other managers were also moved as part of this reorganization, and he admits that he had no knowledge regarding the reorganization of the Mid-Atlantic Division. (SOF ¶ 144.) Moss adds that Pielli specifically instructed him that he would have to both switch to the night shift and relinquish management of multiple supervisors without

---

[6] Moss erroneously uses the name Moore, but it appears that he means Pielli. (*See* CSOF ¶¶ 140, 141.)

explanation.  (CSOF ¶ 143) (citing Ex. 8 ¶¶ 34-37).  Moss consistently worked with multiple managers and crews on the night shift throughout his career without concern by his prior managers.  (CSOF ¶ 143) (citing EX. 8 ¶ 38).

   *e.*  *Moss Is Selected For The Position Of Senior Engineer In Baltimore*

On May 11, 2017, Moss applied for the position of Senior Engineer in Baltimore.  (SOF ¶ 145.)  He was selected and is currently working in this position.  (SOF ¶ 145.)  Keefe approved Moss' placement to the new position.  (SOF ¶ 146.)

## B. PROCEDURAL HISTORY

On March 26, 2016, Moss filed a Complaint against Amtrak, Keefe and Pielli.  (*See* Doc. No. 1.)  In his Complaint, Moss asserts claims for (1) racial discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 ("Title VII"), the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Cons. Stat. §§ 951 *et seq.*, and the Philadelphia Fair Practices Ordinance ("PFPO"), Phila. Code §§ 9-1101 *et seq.*;  (2) retaliation in violation of Section 1981, Title VII, and the PFPO; and (3) aiding and abetting against the individually named Defendants in violation of the PHRA and PFPO.[7]  (*See id.*)  On March 8, 2019, Defendants filed their motion for Summary Judgment.  (Doc. No. 20.)  Moss filed his Response in Opposition on March 29, 2019, and Defendants filed their Reply on April 5, 2019.  (Doc. Nos. 23, 24.)

## II. <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court asks "whether the evidence

---

[7]We have subject matter jurisdiction pursuant to federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367.

presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

## III.   DISCUSSION

Moss brings claims under § 1981, Title VII, the PHRA, and the PFPO alleging that Defendants discriminated and retaliated against him. As to Moss' discrimination claims, which

are based upon a failure to promote, Defendants move for summary judgment on the grounds that it had legitimate reasons for refusing to promote Moss. Moss counters that Defendants' reasons are pretexts for racial and national origin discrimination.[8] Regarding Moss' retaliation claims, Defendants argue that those claims, which must be premised on conduct post-October 23, 2016, do not survive summary judgment because Moss is unable to present any evidence to demonstrate pretext. Moss responds that he complained of racial discrimination, and that he was not promoted in retaliation for those complaints. He also argues that Defendants took various actions in retaliation. We will grant Defendants' Motion as to all claims.

## A. DISCRIMINATION CLAIMS UNDER SECTION 1981, TITLE VII, THE PHRA AND THE PFPO

Moss presents no direct evidence, and only proffers circumstantial evidence; therefore, he claims that Defendants discriminated against him on the basis of race under the pretext analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), which requires him to show that race was a determinative factor in Defendants' failure to promote him. *See Pierce v. City of Phila.*, No. 17-5539, 2018 WL 6832093, at *7-8 (E.D. Pa. Dec. 28, 2018) (stating that, under the pretext discrimination theory, the same legal standard applies to claims under Title VII, § 1981, . . . the PHRA and the PFPO). First, the plaintiff must establish a prima facie case.[9] *See id.*; *see also Stewart v. Rutgers*, 120 F.3d 426, 432 (3d Cir. 1997) (citation

---

[8]Moss references race, color, and national origin asserting that he was discriminated against because he is African-American/Black. We will focus our analysis of Moss' claims as being premised upon his race; however, our analysis equally applies to any national origin claims. *See Alcantara v. Aerotek, Inc.*, 765 F. App'x 692, 696 (3d Cir. 2019) ("In her complaint, Alcantara references both race and national origin but asserts only that she was discriminated against because she is Hispanic, which is a racial classification.") (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 260 n.16 (1995) (Thomas, J. concurring) (noting that groups including Hispanic Americans [and black Americans] are discriminated against on the basis of race)).

[9]Moss' burden to establish a prima facie case is not onerous. *See Pierce v. City of Phila.*, 2018 WL 6832093, at *8 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). He must prove, by a preponderance of the evidence, that he applied for an available position for which he was qualified, but was rejected under circumstances

omitted). If the plaintiff establishes a prima facie case, Defendants "must then 'rebut the presumption of discrimination by producing evidence that [Plaintiff] was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Id.* (quoting *Burdine*, 450 U.S. at 254); *see also Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (stating that the burden of production is "relatively light"). "If [they] can do so, the burden shifts back to [Plaintiff] to show that the [Defendants'] proffered reason for failing to promote [him] was not the true reason for its decision, 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Burdine*, 450 U.S. at 256); *see also Stewart*, 120 F.3d at 432 ("The burden then falls upon the plaintiff to prove that the employer's proffered reason [for the employment action] was not the true reason for the . . . decision[,] but was instead pretextual.").

Moss believes that he was discriminated against when he was not promoted to the Senior Manager position in April 2016, when Keefe chose not to approve Moore's selection of Moss for the position. He also alleges that he was discriminated against when he was not promoted to the Senior Manager position when he applied in December 2016, when Defendants assert that they believed that Tiller was the best qualified candidate for the position. Defendants appear to concede that Moss has established a prima facie case of race and national origin discrimination.[10] They also contend that there is sufficient record evidence of legitimate, non-discriminatory reasons for not promoting him in April and December 2016. Moss does not dispute that Defendants met their burden of proffering a legitimate, non-discriminatory reasons for not

which give rise to an inference of unlawful discrimination. *See id. (citing Burdine*, 450 U.S. at 253; *Booker v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 575, 580 (E.D. Pa. 2012)).

[10]We will assume without deciding that Moss has presented a prima facie case of discrimination.

selecting him for the Senior Manager position. After reviewing Defendants' evidence, we find that their reasons for not selecting Moss in April 2016, and for choosing Tiller over Moss for the Senior Manager position in December 2016, are legitimate, which shifts the burden to Moss to show pretext. Defendants argue that Moss fails to show pretext and summary judgment must be awarded in their favor. We agree.

### 1. Defendants' Legitimate, Non-Discriminatory Reasons

Amtrak provides the following legitimate, non-discriminatory reasons as to why Moss wasn't given the Senior Manager position in April 2016, when Keefe chose not to approve Moore's selection of Moss for the position: (1) the Engineering Department was in the process of being reorganized and Keefe believed that Pielli (Caucasian) should participate in the interviews given that the person selected for the Senior Manager position would, as a result of the reorganization, report directly to him instead of Moore; and (2) Keefe did not believe, based on his experience working with Moss, that Moss was ready for the level of responsibility the position entailed. (Defs.' Mem. Law Support Mot. for Summ. J. at 21) (citing SOF ¶¶ 24-28; *Baron v. Abbott Labs.*, No. 14-4706, 2016 WL 660883, at *6 (E.D. Pa. Feb. 17, 2016) (concluding employer's reorganization was legitimate, non-discriminatory reason for plaintiff's termination); *Langley v. Merck & Co.*, Inc., No. 04-3796, 2005 WL 1279108, at *3 (E.D. Pa. May 25, 2005) (company-wide reorganization was legitimate business reason for employer's decision to reassign plaintiff's position)).

Regarding the failure to promote Moss to the Senior Manager position in December 2016, Defendants provide the following legitimate, non-discriminatory reasons for selecting Tiller over Moss: Pielli and Saverese believed that Tiller was the best-qualified candidate for the Senior Manager position because of his knowledge in communications and signals, which

complemented and augmented the track knowledge of Smith, the Senior Manager in New York. (Defs.' Mem. Law Support Mot. for Summ. J at 22) (citing SOF ¶¶ 61, 83-87). According to Defendants, the focus on communications and signals arose from Pielli's mandate to expand the scope of the Mid-Atlantic North's Region's operations to align with increasing work relating to, among other things, signals. (*Id.*) (citing (SOF ¶¶ 43-45). In addition, Defendants assert that Pielli and Saverese each believed that (1) Tiller had more experience in program – as opposed to single project – management than Moss; (2) Tiller had more relevant experience working with executive management and budgeting than Moss; and (3) Tiller gave better answers during his interview. (*Id.* at 22-23) (citing SOF ¶¶ 83-87; *Ruff v. Temple Univ.*, 122 F. Supp. 3d 212, 218 (E.D. Pa. 2015) (employer's determination that selected candidate had relevant experience was legitimate); *Bristow v. Commonwealth of Pa.*, No. 13-1247, 2014 WL 7232105, *5 (E.D. Pa. Dec. 18, 2014) (evaluation of interview performance was legitimate where candidates had comparable work experience); *Johnson v. Penske Truck Leasing Co.*, 949 F. Supp. 1153, 1176 (D.N.J. 1996) (explaining that subjective evaluations of interview performance can be a determinative factor)).

After viewing Defendants' evidence, we find that its reasons for not promoting Moss in April 2016 and for selecting Tiller over Moss for the Senior Manager position in December 2016 are legitimate, nondiscriminatory business reasons, which shifts the burden to Moss to show pretext.

### 2. *Moss Cannot Meet his Burden to Demonstrate Pretext*

In order to show pretext, the plaintiff must show that the Defendants' proffered reasons for failing to promote him were not the true reasons for their decisions. *See Pierce*, 2018 WL 6832093, at *8. The plaintiff "must point to some evidence, direct or circumstantial, from which

a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Under the first prong, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 765). It is important to note that "[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." *Id.* at 1109 (citation omitted).

Under the second prong, the plaintiff "must identify evidence in the summary judgment record that 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" *Id.* at 1111 (quoting *Fuentes*, 32 F.3d at 762); *see also Boykins v. SEPTA*, 722 F. App'x 148, 152 (3d Cir. 2018) ("To show that an invidious discriminatory reason was more likely than not a cause for the employer's action, the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [race] was a motivating or determinative factor in the employment decision.").

Regarding pretext, Moss acknowledges that Defendants assert two reasons for overlooking him for the position of Senior Manager in April 2016: (1) Amtrak's reorganization and (2) Moss's qualifications. (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 6.) Also, Moss acknowledges that Defendants further assert that the decision not to promote him in December 2016 was based on his experience and expertise. (*Id.*) Moss makes the following three arguments to show that the reasons proffered by Defendants were not a legitimate cause for

failing to promote him: (1) he contends that Amtrak's reorganization and Pielli's desire to interview the candidates for the Senior Manager position are illegitimate because Pielli was aware of the reorganization from the outset of his time as Director in Philadelphia, which was well before the Senior Manager position was posted, and he had every opportunity to be a part of the decision-making process in April 2016; (2) he contends that he was qualified for the Senior Manager position, and the contention that he was unqualified, per Keefe and Pielli, is baseless; and (3) he contends that he and Moore "believe" that Pielli and Keefe were biased. We find that each of these arguments fail.

a.      <i>Pielli's Non-Participation In The April 2016 Interview Process</i>

Moss argues that Amtrak's reorganization and Pielli's desire to be involved in the job selection are not a legitimate cause for failing to promote him. (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 7.) Moss acknowledges that the claim that Pielli should have the opportunity to interview candidates for the Senior Manager position since it reported directly to him sounds valid on its face. (*Id.*) However, Moss argues that the facts do not support that Pielli did not have the opportunity to interview Moss in April 2016:

> As a primary matter, Mr. Pielli was aware of the transition and reorganization process from outset of his time as a Director in Philadelphia, well before the Senior Manager position was posted. According to Mr. Moore, the reorganization project was well underway as early as the beginning of 2015 (Ex. 6, p. 18:14-20:4). Mr. Pielli explicitly acknowledge that "there was always a potential for the department to be united. That was the concept in relationship I had with Mitch [Moore], is that *we were interviewing candidates that could potentially work for either he, I or another leader as a united production crew in the future*" (Ex. 3, p. 53:22-54:2, p. 68:8-11).
>
> During the reorganization, it is agreed by nearly all witnesses that Defendant Pielli and Mr. Moore in-fact worked together, restructuring and hiring within the department (Ex. 5, p. 12:16-13:6; Ex. 2, p. 18:7-25; Ex. 6, p.24:4-19). Mr. Pielli himself even

29

acknowledged that he and Mr. Moore shared the responsibility in 2016 of interviewing 17 positions, specifically stating that they interviewed every position together except where a scheduling conflict arose (Ex. 3, p. 47:5-48:8).

Furthermore, when the position was posted in April of 2016, Mr. Pielli utterly disregarded the application process despite having full knowledge of the applicants and their interviews. First, Pielli was emailed a copy of the applicant list on April 28, 2016 (Ex. 9). During his deposition, Mr. Pielli at first acknowledged receiving the email only later creating a convenient, albeit nonsensical, narrative of not opening the e-mail because he does not open emails that he is merely "cc'ed" on (Ex. Ex. 3, p. 36:21-37:5) Mr. Pielli denied even receiving the resumes of the candidates in the spring of 2016 (Ex. 3, p. 55:4-20). Contrary to his assertions, Ms. Barber asserted with certainty that she would have printed a copy of the applicant resumes and provided Mr. Pielli a copy of the resumes directly (Ex. 5, p. 19:7-22). Conveniently, Mr. Pielli fully recalls receiving the resume e-mail from November of 2016 wherein he was only cc'ed (Ex. 13; Ex. 3, 86:8-21).

Furthermore, Mr. Pielli was emailed a copy of the interview candidates, wherein he was informed of the date of the interviews and provided the questions which would be asked (Ex. 10). Mr. Pielli again denied any knowledge of these interviews as he was only "cc'ed" (Ex. 57:4- 7). Mr. Moore further confirmed Mr. Pielli's availability and potential to be involved, directly stating that Mr. Pielli was involved in the hiring decisions throughout 2016 (Ex. 6, p. 26:7-27:7). In fact, Mr. Moore explicitly recalled discussing posting the position in the spring of 2016 with Mr. Keefe, explaining that Mr. Keefe did not instruct Mr. Moore to put the position on hold prior to the interviews despite reminding Mr. Moore that they were reorganizing the department (Ex. 6, 31:4-32:19).

It is without question that not only was the reorganization on going, but Mr. Pielli was fully aware of the reorganization and had every opportunity to be a part of the decision-making process in April of 2016.

(*Id.* at 7-8.)

Defendants state that it is undisputed: (1) that Pielli did not participate in the interview process conducted by Moore in the spring of 2016; (2) that Keefe wanted Pielli to interview and select the person to be hired for the Senior Manager position, who Pielli would be supervising;

and (3) that Moss believed Pielli when he said he would not hire someone he had not interviewed. (Defs.' Reply at 3) (citing SOF ¶¶ 20-21, 27, 50). They state that, "[i]n an attempt to escape these undisputed facts, Mr. Moss argues that Mr. Pielli could have participated in the interviews because he was copied on emails about them." (*Id.*) (citation omitted).

They assert that the question is not whether Pielli theoretically could have participated in the interview process with Moore. (*Id.*) They point out that Keefe never contended that Pielli was prevented from participating, only that he had not participated. (*Id.*) They further point out that Moore confirmed that, not only did Pielli not participate, he was not invited to participate, and there had been no discussion of Pielli taking over Moore's role at the time of the interviews. (*Id.* at 3-4) (citing Ex. Q, Dep. of Moore, 29:22-25; 42:7-20). Noting that Amtrak's process for conducting interview is not on trial, they focus on the fact that the question is whether Pielli and Keefe discriminated against Moss, and not whether Amtrak conducted the most efficient interview process. (*Id.* at 4.) They argue that Moss cannot demonstrate pretext for discrimination merely by noting that Pielli theoretically could have participated in the interview process with Moore, instead of repeating it after taking over for Moore. (*Id.*) (citing *Dooley v. Roche Lab Inc.*, 275 F. App'x 162, 165 (3d Cir. 2008) (holding that irregularities in interview process and delay in responding to plaintiff did not cast doubt on legitimate reasons for selection proffered by employer)).

We agree with Defendants that Moss cannot demonstrate pretext for discrimination merely by noting that Pielli theoretically could have participated in the interview process with Moore, instead of repeating it after taking over for Moore. There is nothing in the record which could allow a reasonable factfinder to draw an inference of discrimination from the bare assertion Moss presents that Pielli did have the opportunity to interview Moss in April 2016.

Moss neither explains how Pielli having the opportunity to interview in April 2016, and his knowledge about Amtrak's reorganization from its outset, casts doubt on Defendants' articulated hiring rationale nor suggests that they were impermissibly motivated by race or national origin. Nothing about Moss' proffered evidence regarding this issue shows that Defendants' failure to promote him was motivated by his race or national origin.

### b. Qualifications

Moss argues that Defendants' contention that he was not qualified for the Senior Manager position, according to Keefe, is baseless upon review of the record.[11]  (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 9.)  This argument misses the mark because no one ever argued that Moss was unqualified for the position.  (*See* Defs.' Reply at 5.)  As Defendants point out, Pielli and Savarese identified Tiller as being better qualified.[12]  (*See id.*) (citing SOF ¶¶ 57-63, 84-87).  Moss appears to contend that he was more qualified than Tiller.  (*See* Pl.'s Opp'n Defs.' Mot. for Summ. J. at 9.)  To the extent that Moss argues that he is more qualified than Tiller, we note that

---

[11]Moss states that "Mr. Keefe's own history with promotions and pattern of delaying promotions to African American candidates raises serious questions as to his legitimacy in this application process."  (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 9.)  He further states that "[n]ot only does Mr. Moore unequivocally states [sic] that he believes Mr. Keefe to be racist, he further discusses a delay in his own hiring process wherein Mr. Keefe ultimately approved his promotion after nearly four months."  (*Id.*) (citing Ex. 52:13-43:24).  Noting that Moore never heard Keefe directly use a racial slur, Moss argues that, as Moore explained, "his life history as 'being African-American for 63 years' gives him the experience to know that Mr. Keefe's conduct in lying about the position for over two years must be racially motivated . . . As Mr. Moore stated, 'It's blatant.'"  (*Id.*) (citing Ex. 2, 79:7-16; Ex. 6, 82:20).  We do not consider Moss' aforementioned arguments and exhibits as evidence that Keefe has a history and pattern of delaying promotions to African American candidates.  *See Boykins*, 722 F. App'x at 155 ("Statistical evidence of an employer's pattern and practice with respect to minority employment may be relevant to a showing of pretext."); *see also R Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134-35 (4th Cir. 2002) (finding that affidavits of co-workers and a union representative stating that the plaintiff was "discriminated against because of his race," including a statement that "I believe [the manager] is a racist," constituted subject beliefs insufficient to create a genuine issue of material fact on the issue of discrimination); *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990) ("We note than an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment.").

[12]Defendants also state that "Mr. Keefe likewise testified that he 'didn't feel that Mr. Moss was the best qualified candidate' (in addition to the fact, discussed above, that Mr. Pielli had not participated in his interview), which is not the same as saying that Mr. Moss was unqualified."  (Defs.' Reply at 5 n.3) (citing Pl.'s Ex. 3, Dep. of Keefe, 30:1-4).

he "cannot rely on his own allegations that he was best qualified for the positions as evidence of pretext." *Youssef v. Anvil Int'l*, 595 F. Supp. 2d 547, 562 (E.D. Pa. 2009) (citing *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ("The fact that an employee disagrees with an employer's evaluation of him does not prove pretext."); *Williams–McCoy v. Starz Encore Grp.*, No. 02-5125, 2004 WL 356198, at *12 n.30 (E.D. Pa. Feb. 5, 2004) ("[A]n employer is free to make subjective business decisions so long as they are not discriminatory.")); *see also Ruff*, 122 F. Supp. 3d at 218 ("Ruff's subjective comparison of qualifications does not cast sufficient doubt on Temple's stated legitimate reasons for its selection.").

Moss also argues that the decision to characterize the position as a "signals specialist" was clearly a smoke screen created after the fact to cover up Defendants' actions in failing to promote him. (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 12.) In support of his argument, Moss states as follows:

> Mr. Pielli made it clear during his deposition that his expectations of the position after the restricting [sic] were different than the reality of what was shared with the rest of AMTRAK's staff during the hiring process, calling into question exactly when the need for a "signal specialist" really came to fruition. In reality, Mr. Tiller explained that it was only after the reorganization, when he became a Director, only then did he take on responsibilities related to signal construction (Ex. 7, p. 32:15-22). This was corroborated by Mr. Moore who expressly recalled the position requirements not changing until 2018 (Ex. 2, p. 58:5-8).
>
> As a primary concern, the position posted by Defendant Pielli in no way indicates a focus on the need for a signal specialist (Ex. 12). No question exists as to the validity of the posting and, in fact, Defendant Keefe confirm that it was in fact posted by Defendant Pielli (Ex. 2, p. 37:9-12). The positing [sic] clearly states that throughout that the position requires a high level of construction knowledge and was focused on "long-term programs for capital and maintenance track construction projects" (Ex. 12). Mr. Moore stated that the position would entail an estimated 90 percent of track work

(Ex. 2, p. 66:6-9). Mr. Keefe even stated himself that the position would consists of "probably 25 percent communications and signals" (Ex. 2, 40:18-41:2). When questioned about the lack of Signals/Communications requirements on the positing [sic] itself, Mr. Pielli stated "It wasn't necessary" (Ex. 4, p. 120-122).

Terry Tiller's own qualification of his expertise in his deposition heavily focused on his signal construction experience (Ex. 7, p. 20:21-21:17). Contrary to Mr. Tiller's limited experience with track construction, and more specifically the Track Construction Capital Program, Mr. Moss was "the most familiar with it" (Ex. 6, p. 35:11-36:6, p. 39:3-5).

The Defendants also limited who actually had a say in discussing the candidates after the December 2016 interviews. Despite trying to downplay Ms. Barber's role in the interview process, both Ms. Barber and Mr. Pielli assert that Ms. Baber [sic] was given the opportunity to provides [sic] feedback as to the candidates (Ex. 5, p. 32:11-20, Ex. 4, p. 150:14-25). The only difference in their recollection of the candidate discussion was that Ms. Barber has consistently held that she stated Mr. Moss was the most qualified candidate, a fact she reiterated during AMTRAK's EEO Investigation (Ex. 5, p. 33:5-6, p. 38:24-39:8; Ex. 11). Furthermore, despite having previously gone through the same hiring process a mere seven months earlier, and despite his extensive experiences with the candidates, Mr. Pielli never made an effort to contact Mr. Moore about the candidates he interviewed, let alone invited Mr. Moore to participate in the process at all (Ex. 6, 50:18-23).[13]

Defendants' credibility as to their articulated reasoning for Mr. Moss not being selected has to be called into questions as a result of the above. Ultimately, "[i]t is firmly established that a court's role is not one of resolving issues of credibility. Any inconsistencies that may exist between the deposition testimony of the plaintiff and her affidavit submitted in opposition to the summary judgment motion, generally present credibility issues for trial. *See, Knepka v. Tallman*, 278 AD2d 811 (4th Dept. 2000); *Yaziciyan v. Blancato*, 267 AD2d 152 (1st Dept. 1999). The court may not "weigh the credibility of the affiants on a motion for summary judgment unless it clearly appears that the issues are not genuine, but feigned." *Glick & Dolleck, Inc. v. Tri-Pac Export Corp.*, 22 NY2d 439 (1968); *see also, Weiss v. Gerard Owners Corp.*, 22 AD3d 406 (1st Dept. 2005).

(*Id.* at 10-12.)

---

[13]Moss states that "Mr. Pielli's own testimony is directly contradicted by Mr. Moore." (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 11 n.2) (citing Ex. 3, 90:10-18).

Defendants assert that Moss misrepresents Pielli's testimony. (Defs.' Reply at 5.) They state that he testified that it was not necessary to specify signals and communications experience in the job posting because the posting was "boilerplate" and did not take the reorganization into account. (*Id.*) (citing Pl.'s Ex. 4, Dep. of Pielli, 118-122). Furthermore, they state that it was implied by the scope of the job title. (*Id.*) Relying on Pielli's deposition testimony, they argue that "'[t]he grade in band for a senior manager production at times includes planning and integration [and] could include . . . managers with particular backgrounds.'" (*Id.*) (citing Pl.'s Ex. 4, Dep. of Pielli, 120:17-20).

They also argue that "Mr. Moss similarly misrepresents Mr. Tiller's testimony, in which he explained how his title changed and his role expanded in a later phase of the reorganization (Plf. Exh. 7, Tiller Dep. 32:12-22), as meaning that Mr. Tiller did not perform any C&S work in the Senior Manager position." (*Id.* at 6) (citing Pl.'s Opp'n Defs.' Mot. for Summ. J. at 10). However, Defendants note that Tiller was never asked to describe how much signals and communications work his job as Senior Manager entailed, and no evidence has been adduced to suggest that he did not perform the work for which he was hired. (*Id.*) (citing Pl.'s Ex. 7, Dep. of Tiller, 32:12-22). Furthermore, they argue that "Mr. Moss' opinion of his qualifications vis-à-vis Mr. Tiller's qualifications is wholly irrelevant and cannot satisfy his burden to offer credible evidence of pretext." (*Id.*) (citing *Drummond v. Phila. Gas Works*, No. 05-5378, 2007 WL 789421, at *4 (E.D. Pa. Mar. 14, 2007) (the determinative factor regarding qualifications is the view of the decision maker, not the employee); *Dooley*, 275 F. App'x at 165 (holding that plaintiff could not show pretext by pointing to evidence that she was more qualified than the person selected in some respects, because that evidence merely showed that she was qualified, not that the proffered explanation was pretext); *see also Ruff*, 122 F. Supp. 3d at 218 ("Ruff's

subjective comparison of qualifications does not cast sufficient doubt on Temple's stated legitimate reasons for its selection.")).

Moreover, Defendants argue that Moss' attempt to rely on Moore's opinion of his qualifications is equally futile because there is no dispute that Moore was not involved in the decision to select Tiller and, in fact, was no longer even working in Philadelphia at the time. (*Id.*) (citing SOF ¶¶ 163-154; CSOF ¶¶ 163-164).  They state that, after Moore left Philadelphia, Pielli focused on expanding the Mid-Atlantic North Division's scope of work;[14] therefore, Moore's opinion about who was best suited to the Senior Manager position in the Mid-Atlantic North Division cannot be anything more than pure speculation, which is not evidence of pretext. (*Id.* at 6-7) (citing SOF ¶ 43; *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 413 (E.D. Pa. 2000) ("Pretext cannot be established based on speculation and mere conclusory allegations."); *Drummond*, 2007 WL 789421 at *4 (rejecting conclusory allegations and "personal conjecture" as evidence of pretext)).

Defendants next turn their attention to Moss' argument that Barber, who was part of the interview panel with Pielli and Savarese, "consistently . . . stated Mr. Moss was the most qualified candidate."  (*Id.* at 7.)  They assert that Moss' contention is flatly contradicted by the record because Barber has consistently stated she does not know why Tiller was selected because she was not a decision-maker.  (*Id.*) (citing SOF ¶¶ 56, 89; CSOF ¶¶ 56, 89).  In addition, Defendants note that "[Barber] testified that Moss and Tiller were both qualified, that Mr. Moss had more track experience, that Mr. Tiller had more C&S experience, and that if she remembered correctly, the Senior Manager position was geared more toward track but required 'more overall

---

[14]In a footnote, Defendants state "Mr. Moss purports to deny this fact by citing to testimony by Mr. Moore, who did not work in the newly-created Mid-Atlantic North Division."  (Defs.' Reply at 7 n.5) (citing SOF ¶¶ 37-38; CSOF ¶¶ 37-38).

knowledge.'" (*Id.*) (citing Pl.'s Ex. 5, Dep. of Barber, 33:3-13, 38:9-8).  They argue that "[n]o

evidence supports Mr. Moss' interpretation of this testimony to mean that Mr. [sic] Barber

opined he was 'the most qualified,' . . . [and], [i]n any case, it is undisputed that Ms. Barber was

not a decision-maker because she possessed no relevant technical expertise in engineering." (*Id.*)

(citing SOF ¶ 56; CSOF ¶ 56).  Thus, according to Defendants, "even if Ms. Barber had

expressed an opinion that Mr. Moss was most qualified for the position (which she did not), it

would not establish that Mr. Pielli disbelieved the reasons he expressed for selecting Mr. Tiller."

(*Id.*)

Regarding Keefe, Moss' argument of bias is that Keefe temporarily placed the Senior

Manager position on hold and also purportedly delayed one of Moore's promotions.  (*Id.*) (citing

Pl.'s Opp'n Defs.' Mot. for Summ. J. at 9-10).  Defendants state that "[s]ince Mr. Moss and Mr.

Moore are both African American, Mr. Moss asks the Court to infer that Mr. Keefe must be

biased against African Americans[15]. . . .  As a threshold matter, Mr. Moss' contention is flatly

contradicted by the record." (*Id.* at 8-9.)  They point out that Moss argues that Moore "believes"

that Keefe is a racist even though "Mr. Moore actually testified that it was Mr. Keefe who

*resolved* – not *caused* – the purported delay in his promotion." (*Id.* at 9) (citing SOF ¶ 158;

CSOF ¶ 158; SOF ¶ 159; CSOF ¶ 159).  They further  argue that "[Moss] contends that Mr.

Moore's speculation has some significance because Mr. Moore's years of experience as an

African American man allowed him to 'know' that Mr. Keefe was 'lying about the [Senior

Manager] position for over two years.'" (*Id.*) (citing Pl.'s Opp'n Defs. Mot. for Summ. J. at 10).

However, they stress that "Mr. Moore admits that he was not privy to the reason the Senior

---

[15]Defendants, in a footnote, argue that Moss' self-serving affidavit asserts that he is aware of "multiple African employees who had their promotion process unreasonably delayed."  (Defs.' Reply at 9 n.6 ) (citing Moss' Aff. ¶ 16).  They stress that Moss does not provide a single example or attribute any purported delay to Keefe.  (*See id.*)

Manager position was placed on hold, except that it related to the reorganization," and "Mr. Moore's opinion is, by his own admission, not based on any experience with Mr. Keefe, but on Mr. Moore's life experience as an African American."  (*Id.*) (citing Pl.'s Ex. 6, Dep. of Moore, 18:14-20:11, 83:10-12; SOF ¶ 160; CSOF ¶ 160).

After reviewing the record and the parties' arguments, we conclude that Moss has not shown that the decision to characterize the Senior Manager position as a "signals specialist" was a smoke screen created after the fact to cover up Defendants' actions in failing to promote him. Quite simply, none of Moss' arguments show that the decision to hire Tiller was so plainly wrong that it could not have been Amtrak's real reason or that the "signal specialist" characterization demonstrates such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions that a reasonable factfinder could rationally find it unworthy of credence.  Moss has not presented any evidence that would permit a trier of fact to disbelieve Defendants' asserted reasons for delaying or denying him the promotion, or suggest that discrimination was more likely than not the motivating factor.  The alleged inconsistencies noted by Moss appear race-neutral and do not, in and of themselves, give rise to an inference of racially discriminatory animus.

Moss points to nothing more evidencing discrimination in the record.  His arguments are speculative and do not point to any evidence showing that Amtrak's two officials, and co-Defendants, Pielli and Keefe, acted with any discriminatory animus.  Moss admits that he never heard Pielli, Keefe, or anyone else at Amtrak make a racially derogatory remark.  (Defs.' Reply at 8) (citing SOF ¶ 148; CSOF ¶ 148).  He also admits that he has no basis to believe that Pielli ever treated any white manager working under him more favorably than any African-American manager.  (*Id.*) (citing SOF ¶¶ 150-151; CSOF ¶¶ 150-151).  Additionally, Moss admits that he

believed Pielli began a new interview process for the Senior Manager position because he would not hire someone he had not interviewed. (*Id.*) (citing SOF ¶ 50; CSOF ¶ 50).

Likewise, Moss' argument of bias against Keefe that he temporarily placed the Senior Manager position on hold and also purportedly delayed one of Moore's promotions fails to show pretext. We will not allow Moss to rely upon Moore's speculation, who appears not to have any relevant knowledge of the factual background for the business decision by Defendants, and no personal experience with the decision-maker that is suggestive of bias, to show pretext. Apart from Moss' conclusory allegations and Moore's speculation, he has not pointed to any record evidence that could support any discriminatory behavior by Pielli or Keefe to support his theory.

Since Moss has failed to produce evidence that would cause a reasonable factfinder to disbelieve the reasons stated by Defendants or believe that an underlying motive was discrimination, we find that summary judgment is appropriate as to Moss' discrimination claims under Section 1981, Title VII, the PHRA, and the PFPO.

### B. RETALIAITON CLAIMS UNDER TITLE VII AND THE PFPO[16]

---

[16]Moss brings a retaliation claim under Section 1981. (Compl. at 7-8.) However, since Moss has failed to establish an underlying Section 1981 race discrimination violation, his retaliation claim under Section 1981 is foreclosed. *See Collins v. Kimberly-Clark Penn., LLC*, 247 F. Supp. 3d 571, 604–05 (E.D. Pa.), *aff'd*, 708 F. App'x 48 (3d Cir. 2017) (stating that, "as a threshold matter, the plaintiff must demonstrate that there has been an underlying §1981 race discrimination violation in a 1981 retaliation case") (citing *Estate of Oliva ex rel. McHugh* v. *N.J.*, 604 F.3d 788, 798 (3d Cir. 2010); *Ellis v. Budget Maint., Inc.*, 25 F. Supp. 3d 749, 753 (E.D. Pa. 2014) (same); *Johnson v. Labor Force, Inc.*, No. 10-199, 2011 WL 6303192, at *2 (E.D. Pa. Dec. 15, 2011) (same)). Consequently, Defendants are entitled to summary judgment on Moss' Section 1981 retaliation claim. *See Collins*, 247 F. Supp. 3d at 605 ("Because Plaintiff has failed to establish an underlying § 1981 race discrimination violation in this case, her associated claim of retaliation is foreclosed and Defendant is entitled to summary judgment on said claim."). Nevertheless, the standard we will apply, and our analysis, regarding Moss' retaliation claims under Title VII and the PFPO apply equally to his Section 1981 retaliation claim.

Also, Moss does not appear to allege any retaliation claim under the PHRA. (*See* Compl.; Pl.'s Opp'n Defs.' Mot. for Summ. J. at 12.) However, any such claim would be subject to the same standard and analysis as Moss' other retaliation claims. *See Prise v. Alderwoods Grp., Inc.*, 657 F. Supp. 2d 564, 605 (W.D. Pa. 2009) ("In the absence of contrary guidance from the Pennsylvania courts, the United States Court of Appeals for the Third Circuit has construed the PHRA's antiretaliation provision coextensively with Title VIFs [sic] antiretaliation provision."); *see also Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims[.]").

Similar to our analysis of Moss' failure to promote claim, which is based on circumstantial evidence, we will consider Moss' retaliation claims under Title VII and the PFPO under the three-part burden-shifting framework set forth in *McDonell Douglas*, 411 U.S. at 792. *See Anderson v. Boeing Co.*, 694 F. App'x 84, 86 (3d Cir. 2017) (applying the *McDonnell Douglas* framework to retaliation claims under Title VII, Section 1981, and the PHRA); *Darby v. Temple Univ.*, 216 F. Supp. 3d 535, 543 (E.D. Pa. 2016) ("PFPO claims are generally evaluated under the same legal framework as Title VII claims."). To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that (1) he or she engaged in a protected activity, (2) the employer took an adverse action against him or her, and (3) there is a causal link between the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

Once a plaintiff establishes a prima facie claim of retaliation, the burden of production shifts to the employer to present a legitimate, non-discriminatory reason for its conduct. *Id.* at 342; *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997) (stating that the employer's burden at this stage is "relatively light"). If the employer advances such a reason, the burden shifts back to the plaintiff "'to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" *Moore*, 461 F.3d at 342 (quoting *Krouse*, 126 F.3d at 501). The plaintiff has the ultimate burden to prove that "his or her protected activity was a but-for cause of the alleged adverse employment action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Collins v. Kimberly-Clark Penn., LLC*, 708 F. App'x 48, 54 (3d Cir. 2017) ("To prove causation at the pretext stage, the plaintiff must show that she would not have suffered an

adverse employment action 'but for' her protected activity.").

Moss asserts that Defendants retaliated against him for complaining to Bitar, on October 23, 2016, that Amtrak treated white managers differently in the promotional process. Defendants do not dispute that Moss engaged in protected activity in October 2016 and argue that his retaliation claims must be premised on conduct post-dating October 23, 2016. (Def.'s Mem. Law Support Mot. for Summ. J. at 33.) Moss does not dispute the timing of his retaliation claim as Defendants set it as after October 23, 2016, but argues that Defendants' conduct following Moss' complaint of discrimination was clearly retaliatory. (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 12.) Moss' retaliation claim is premised upon the following grounds: (1) Pielli's enforcement of Amtrak's Policy and Reimbursable Business Travel Expense policy ("Amtrak's Expense Policy") denying Moss' travel expenses was retaliatory; (2) Pielli's application for a leave of absence of Moss' behalf was retaliatory; and (3) Pielli moving Moss to the night shift and relinquishment of management of multiple supervisors without explanation was retaliatory. (*Id.* at 12-15.) Defendants argue that they had legitimate, non-discriminatory reasons for Pielli's actions, and Moss cannot show pretext. Regarding Pielli's application for a leave of absence of Moss' behalf, they additionally argue that it was not an adverse employment action. We agree with Defendants that summary judgment should be entered in their favor. We will address each of Moss' arguments in turn.

### 1. Pielli's Enforcement of Amtrak's Expense Policy Denying Moss' Travel Expenses

Moss argues that Pielli penalized him, and financially hurt him, by taking the active step of denying his travel expenses. (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 14.) Moss relies upon the deposition testimony of Moore and Pielli. (*See id.*) Regarding Moore's testimony, Moss states that "[a]ccording to Mr. Moore, Mr. Moss has a history of requesting reimbursement on

his travel expenses as Mr. Moss traveled from Baltimore to Philadelphia every week for work" and "Mr. Moore said, the policy was that employees who worked at Headquarters in Philadelphia would 'not stay within the city limits, a policy which Mr. Moos [sic] abided by.'" (*Id.*) (citing Ex. 2, 71:15-72:13; 72:19-73:17).

Regarding Pielli's testimony, Moss points out that Pielli explained his decision to deny Moss' expense reimbursement by stating that, "[m]y opinion, again, is that had been manipulated, particularly for Victor." (*Id.*) (citing Ex. 4, 167:4-5). Moss asserts that Pielli denied Moss' requests before he took any steps to determine whether the conduct was consistent with Amtrak's Expense Policy. (*Id.*) (citing Ex. 14). He also contends that "Mr. Pielli was fully aware that Mr. Moss had previously been provide [sic] reimbursements by Mr. Moore and made the decision to deny those reimbursements because he felt it was 'unfair to everyone else in the production group' and not because it went against policy." (*Id.*) (citing Ex. 4, 167:4- 13). He further states that "Mr. Pielli himself acknowledged the same policy asserted by both Mr. Moss and Mr. Moore, wherein 'outside that circle [around Philadelphia] you were allowed to get provisions and stay.'" (*Id.*) (citing Ex. 4, 169:11-15).

We agree with Defendants' explanation of Moss' claim as being solely based upon the fact that Moss' prior supervisor, Moore, interpreted Amtrak's Expense Policy to allow Moss' expenses and, when Pielli became his supervisor, he enforced the policy by not permitting Moss' expenses. (Defs.' Reply at 10.) Moss does not offer any evidence that Pielli enforced the policy incorrectly or differently that he did for any other employee under his supervision. Also, Moss' assertions that Pielli did not get confirmation until after he denied Moss' expenses is belied by Pielli's testimony that he spoke with two people in Human Capital and that "the situation went around and around for awhile." (*Id.* at 10 n.7) (citing Ex. P., Dep. of Pielli, 171:13-172:1).

Furthermore, Moss does not offer any evidence whatsoever to suggest that Pielli's decision to enforce Amtrak's Expense Policy was motivated by retaliation. In fact, it appears that Pielli reasonably applied and enforced it. The absence of any argument or evidence of disparate or improper application of the policy vitiates any suggestion of retaliatory animus that could lead a factfinder to reasonably disbelieve Defendants' proffered legitimate, non-retaliatory reason for the enforcement of the policy and reasonably believe that Pielli was motivated by retaliatory animus. *See Acevedo v. Stroudsburg School Dist.*, No. 3:15-2035, 2018 WL 1370875, at *7 (M.D. Pa. Feb. 15, 2018), *report and recommendation adopted*, No. 3:15 2035, 2018 WL 1370598, at *1 (M.D. Pa. Mar. 16, 2018) (denying retaliation claim where plaintiff failed to show pretext regarding Defendant's enforcement of a policy). Moss has failed to tender any evidence to overcome the non-retaliatory explanation offered by Defendants that Pielli was properly enforcing Amtrak's Expense Policy. Therefore, he has not presented sufficient evidence to create a genuine issue of material fact as to whether Defendants' articulated reason for denying Moss' travel expenses was really pretext for relation. *See Moore*, 461 F.3d at 342 (stating that the pretext step in a retaliation case requires the plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action").

### 2. *Pielli's Application for a Leave of Absence on Moss' Behalf*

Moss argues that "the decision by Defendant Pielli to unilaterally apply for a leave of absence on behalf of Mr. Moss is [sic] simply eludes logic." (Pl.'s Opp'n Defs.' Mot. for Summ. J. at 13.) Pointing to Keefe's deposition testimony that he did not believe he could ever apply for a medical on behalf of an employee, "unless the employee was incapacitated in some way or asked me to," Moss argues that the record is clear that he never asked Pielli to complete this

form on his behalf. (*Id.*) (citing Ex. 2, 62:15-25). He also points to Moore's deposition testimony that he has never completed a form on behalf of an employee, stating "It's illegal." (*Id.*) (citing Ex. 2, 74:1-3).

Moss asserts that "[o]nly Mr. Pielli believed this to be the appropriate step," and he "acknowledged that he submitted the leave form on Mr. Moss' behalf because he had not heard from Mr. Moss." (*Id.*) He also states that "Mr. Pielli asserts he took this step because no one knew were Mr. Moss was (Ex. 4, 180:5-10) and Mr. Moss never notified anyone at AMTRAK as to why he was not at work (Ex. 4, 182:12-21)." (*Id.*) According to Moss, "[u]ltimately, Defendants' themselves acknowledge that as a result, Mr. Moss, even if only temporarily, [w]as impacted and was without wages." (*Id.*) He also stresses that "Mr. Pielli 'caught his error,' conveniently before Mr. Moss announced his return" and "[n]o justification has been provided for how Mr. Pielli because some [sic] lucky with this timing." (*Id.*) (citing Ex. 15.)

Defendants argue that Moss offers no evidence to demonstrate that Pielli's request for medical leave was an adverse action or that it was done for a retaliatory purpose. (Defs.' Reply at 12). They make the following arguments:

> Mr. Moss argues in his opposition that Mr. Moore testified that "it's illegal" for a supervisor such as Mr. Pielli to fill out a leave request for an employee. (Plf. Br. p. 13). This claim, which is demonstrably incorrect, is apparently Mr. Moss' entire basis for contending that it was an adverse action for Mr. Pielli to fill out a Request for Leave form in January of 2017 (while Mr. Moss was actually absent for medical reasons). It is clear on the face of the Request for Leave form that it is supposed to be filled out by a supervisor and only a supervisor. (Exhibit LL, Moss Dep. Exh. 24). The form asks for the name of the "Submitter" separately from the name of the employee and instructs the submitter to prepare the form when "the employee" begins a leave and again when "the employee" returns from leave. (*Id.*) The supervisor must sign the form under this language: "Thank you for completing this form. Please sign below to certify that to the best of your knowledge the information given on this form is accurate." (*Id.*) The form includes no signature line for the employee

and provides no information to the employee. (*See id.*) The form's instructions explain that it is used not only to request a leave of absence, but also to suspend an employee or designate an employee's leave as unauthorized. (Exhibit MM, Moss Dep. Exh. 25). Obviously, an employee would not be expected to submit a request to suspend himself or designate his own leave as unauthorized. The form is clearly intended for supervisor use and *only* supervisor use. Thus, Mr. Moss' theory that Mr. Pielli did something untoward by submitting the form is objectively baseless.

Nonetheless, Mr. Moss contends that Mr. Keefe also testified he could not fill out a Request for Leave form unless the employee was incapacitated or asked him to do it. (Plf. Br. 13.) However, Mr. Moss's reliance on Mr. Keefe's testimony is misguided. Mr. Keefe was not asked whether a supervisor may fill out a Request for Leave form, which is what Mr. Pielli completed on Mr. Moss's behalf. Instead, Mr. Keefe was asked whether he has ever filled out an application on behalf of an employee for leave pursuant to the Family and Medical Leave Act ("FMLA"). (Plf. Exh. 3, Pielli Dep. pp. 61:13-62:25.) An FMLA request requires, in addition to Amtrak's internal Request for Leave form (completed by the employee's supervisor), that the employee submit a Certification of Health Care Provider, which Mr. Keefe referred to as the employee's "application" during his deposition. (Plf. Exh. 3, Pielli Dep. p. 61:13-24; see also Exhibit PP, Moss Dep. Exh. 31). Mr. Keefe's testimony regarding his understanding of how to complete FMLA paperwork is inapposite to what steps a supervisor may or may not take on behalf of an employee regarding a Request for Leave form. Mr. Moss is either intentionally conflating Amtrak's internal Request for Leave form with the FMLA Certification or does not understand the difference.

Furthermore, the undisputed evidence shows that Mr. Moss had been absent for a medical reason for five days at the time that Mr. Pielli submitted the Request for Leave form. (SOF ¶ 117; CSOF ¶ 117). These factors comport with the requirements for a request for Short Term Disability leave as set forth on the form's instructions. (See Exhibit MM, Moss Dep. Ex. 25). Mr. Moss cannot seriously contend that Mr. Pielli did something adverse to him by completing the form under these circumstances. And, of course, Short Term Disability is a benefit of employment that replaces compensation during periods of disability. It is a nonsensical proposition to contend that Mr. Pielli took an adverse action against Mr. Moss by applying for a benefit on his behalf.

That leaves us with Mr. Moss' argument that his pay was briefly impacted by the request for Short Term Disability. Mr. Moss admits that Mr. Pielli cancelled the request for leave on the same day that he submitted it, when Mr. Moss' physician provided a note indicating that his period of incapacity was ending. (SOF ¶ 117; CSOF ¶ 117). Mr. Moss also does not dispute that Amtrak's Human Resource's department processed the request despite Mr. Pielli's attempt to cancel it. (SOF ¶ 119; CSOF ¶ 119). This is clearly what resulted in the temporary offset against Mr. Moss' pay for anticipated disability benefits. Mr. Moss offers no evidence of how much his pay was offset or how long it took to correct. He does not suggest that he suffered any hardship or that he encountered any difficulty or delay in having the correction made. In other words, he offers nothing to suggest that he suffered more than a minor inconvenience. A minor inconvenience is not an adverse action upon which a retaliation claim may be premised. [*Glanzman v. Metro. Mgmt. Corp.,* 290 F. Supp. 2d 571, 582 (E.D. Pa. Nov. 5, 2003)] ("To be 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience . . . ."). Even if any of these acts were considered an adverse action (which they are not), there is no evidence to support Ms. Moss's claim that they were taken for a retaliatory reason.

(*Id.* at 12-14.)

Moss throws out many allegations ranging from possibly illegal action to suspicion of Pielli's timing to withdraw his request, but fails to offer any showing whatsoever that he would not have suffered an adverse employment action 'but for' his complaint to Bitar in October 2016. Without delving into whether the submission by Pielli of a Request of Leave of Absence form, in which he approved of Moss taking Short Term Disability Leave effective as of January 12, 2017, is an adverse employment action, we note that it can certainly be argued that Pielli's action was not materially adverse. "In evaluating whether actions are materially adverse, we must remain mindful that 'it is important to separate significant from trivial harms' because '[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" *Moore*, 461 F.3d at 346 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68

(2006)). "Furthermore, we must identify what [materially adverse actions] . . . a reasonable jury could link to a retaliatory animus for each individual officer." (*Id.*) (citation and internal quotation marks omitted). We note that Moss has not proffered any evidence of how much his pay was offset or the amount of time that it took to correct. Without such evidence, it can be reasoned that Moss suffered a minor inconvenience.

Significantly, Moss offers no other evidence to suggest that Pielli's submission of a Request of Leave of Absence form was because Moss had previously made a complaint of discrimination, and as such, no reasonable juror could conclude that Pielli's action was taken for a retaliatory reason. Moss has not tendered sufficient evidence to overcome the non-retaliatory explanation offered by the Defendants; namely, Pielli believed that Moss should be approved for Short Term Disability after he had been absent from work for five days for a medical reason, and he immediately attempted to cancel the request as having been submitted in error. As a result, Moss has not presented sufficient evidence showing pretext. *See Moore*, 461 F.3d at 342 (stating that the pretext step in a retaliation case requires the plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action").

### 3. *Pielli Moving Moss to Night Shift and Relinquishment of Management of Multiple Supervisors Without Explanation*

Moss' retaliation claims regarding Pielli's decision to move him to night shift and relinquishment of multiple supervisors are as follows:

> Next, Mr. Pielli conveniently asserts that the decision to have Mr. Moss moved to night shift was not actually mandated but rathe [sic] a suggestions [sic] (Ex. 4, p. 203:12-17). Mr. Pielli also recalls the conversation wherein Mr. Moss was moved to night shift completely different than all others involved. Mr. Pielli would have everyone believe that Mr. Moss became "highlighted," became irate and walked out of the room (Ex. 4, p. 173:18-174:4). To the contrary,

all other parties present for that meeting, including Mr. Moss recall the meeting as not being heated, despite Mr. Moss becoming overwhelmed and leaving early.

As Mr. Moss has consistently stated since the outset of this case, Mr. Pielli specifically instructed him that he would have to both switch to the night shift and relinquish management of multiple supervisors without explanation (Ex. 8, par. 34-37). Mr. Moss consistently worked with multiple managers and crews on the night shift throughout his career without concern by his prior managers. *Id.* Par. 38.

(Pl.'s Opp'n Defs.' Mot. for Summ. J. at 14-15.)

Regarding Moss' move to night shift, Defendants argue that Moss was only slightly inconvenienced for a short period when he briefly worked midnights. (Defs.' Reply at 11.) They state that "Mr. Pielli asked [Moss] to work nights with his crew on a single occasion, that after doing so for two weeks, a different supervisor asked Mr. Moss to 'make some adjustments to spend a little time with the manager during the day shift,' and that a week later, Mr. Moss returned to the day shift." (*Id.*) (citing SOF ¶¶ 107-08.) They assert that "Mr. Moss admits that other mangers visited their crews during night shifts" and "[h]e essentially concedes that he, in contrast, had not been visiting his crews but, instead, just called them at the beginning of their shifts and checked in with them in the morning." (*Id.* at 11-12) (citing SOF ¶ 111; CSOF ¶ 111). Pielli testified that other managers with night crews visited their crews on the night shift, and it did not work for Moss to always be in the office given that his crew worked nights. (*Id.* at 112) (citing SOF ¶ 111. Defendants conclude their argument by stating that "Mr. Moss can offer no evidence to suggest that Mr. Pielli retaliated against him merely by asking him to do what every other manager of night crews did, *i.e.*, actually working with his crews at times" and "[h]is speculation that Mr. Pielli wanted to 'humiliate' him by asking him to do what every other manager does is baseless and unsupported by any evidence." (*Id.* at 15.)

We find that Moss offers no evidence to suggest that Pielli assigned him to work the night shift because he had previously made a complaint of discrimination, and, as such, no reasonable juror could conclude that Defendants' stated reasons for moving him to the night shift are pretextual.  Pielli explained that he wanted Moss to work the night shift because other managers with night crews visited their crews on the night shift, and Moss was not visiting his crew, but, instead chose to remain in the office and call them at the beginning of their shift and checking in with them in the morning.  This explanation is undeniably reasonable.  Moss fails to counter the explanation by showing that he was treated less favorably by Pielli or that his reason is riddled with inconsistencies and contradictions.  Moss fails to present sufficient evidence to create a genuine issue of material fact as to whether Defendants' articulated reason for wanting Moss to work the night shift was really pretext for retaliation.

Moss does not present much of an argument or evidence regarding his claim that he was retaliated against when Defendants shifted certain persons who reported to him to other managers without explanation.  (*See* Pl.'s Opp'n Defs.' Mot. for Summ. J. at 15.) (citing Moss' Aff. ¶¶ 34-37).  He states that "[he] consistently worked with multiple managers and crews on the night shift throughout his career without concern by his prior managers."  (*Id.*) (citing Moss' Aff. ¶ 38).  In his affidavit, Moss states that "[I] did not observe Mr. Pielli subject any other managers to similar changes."  (*Id.*) (Moss' Aff. ¶ 36).  Defendants state that "[i]n his deposition, Mr. Moss testified that he never asked Mr. Pielli to explain why he shifted certain of Mr. Moss' employees to other managers during the reorganization, and he does not know if Mr. Pielli shifted anyone else's employees to other managers."  (Defs.' Reply at 15) (citing SOF ¶¶ 143-144).  They state that "Mr. Moss *admits* these facts," and, yet, "[h]e nonetheless states in his self-serving affidavit that he 'did not observe Mr. Pielli subject any other managers to similar

changes.'" (*Id.*) (citing CSOF ¶¶ 143-144; Moss' Aff. ¶ 36). They argue that "[t]o the extent that Mr. Moss means he does not *know* if Mr. Pielli subjected other managers to similar changes, he is admitting to having no evidence of retaliation," and "[t]o the extent that Mr. Moss means Mr. Pielli did not actually subject other managers to similar changes, the affidavit must be disregarded as it flatly contradicts Mr. Moss's own sworn deposition testimony." (*Id.*) (citing *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 706-707 (E.D. Pa. 2016) (citing *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (neither a self-serving, conclusory affidavit nor a "sham" affidavit that contradicts the plaintiff's own testimony may be used to create a genuine issue of fact to defeat summary judgment)).

Moss has not presented sufficient evidence to create a genuine issue of material fact as to whether Defendants' articulated reason, *i.e.*, Amtrak's reorganization of the Mid-Atlantic Division, for shifting people who reported to him to other managers was really pretext for retaliation. Moss admits that he has no knowledge regarding the details of the reorganization of the Mid-Atlantic Division. (*See* Defs.' Mem. Law Support Mot. for Summ. J. at 37) (citing SOF ¶ 36). The inconsistencies in Moss' affidavit and deposition testimony, as highlighted by Defendants, show that Moss is unaware if Pielli subjected other managers to similar changes. Again, we conclude, based on the record before us, that Moss fails to present sufficient evidence to create a genuine issue of material fact as to pretext regarding the change in the number of people who reported to him.

In sum, after considering all of Moss' retaliation claims together, we conclude that he has failed to show evidence that is sufficient to establish pretext. *See* Moore, 461 F.3d at 345 (stating that pretext determinations depend on the "totality of the circumstances"). We find that there is insufficient evidence of retaliatory animus in this case that would allow Moss to

overcome the non-retaliatory reasons proffered by Defendants for the actions taken. To the extent that Moss relies upon temporal proximity to establish pretext, we conclude that such reliance does not overcome the fact that he offers no other evidence to suggest that Defendants' alleged retaliatory actions were because he had previously made a complaint of discrimination to Bitar, and, as such, no reasonable juror could conclude that Defendants' stated reasons for their actions are pretextual.

### C.    AIDING AND ABETTING CLAIMS UNDER THE PHRA AND PFOP

Moss' aiding and abetting claims under the PHRA and PFPO fail as a matter of law because "[i]f the employer is not liable for any discriminatory practice then an individual employee cannot be held liable for aiding and abetting a discriminatory practice." *Scott v. Sunoco Logistics Partners, LP*, 918 F. Supp. 2d 344, 357 n.5 (E.D. Pa. 2013) ("Individual Defendants cannot be liable for aiding and abetting Sunoco's discrimination and retaliation in violation of the PHRA because Sunoco is not liable for discrimination or retaliation."); *see also Fleet v. CSX Intermodal, Inc.*, No. 17-3562, 2018 WL 3489245, at *19 (E.D. Pa. July 18, 2018) (concluding that plaintiff's aiding and abetting claims under the PHRA and PFPO do not survive summary judgment "[b]ecause we find [plaintiff] does not meet his burden of showing any discriminatory practice by [defendant], neither Mr. Lowe nor Mr. Gomez can be liable for aiding and abetting a discriminatory practice."); *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 414 n.20 (E.D. Pa. 2014) ("Although the PHRA permits claims against individuals for aiding or abetting an unlawful discriminatory practice, . . . individual employees cannot be held liable if the employer is not liable for a discriminatory practice."), *affirmed*, 587 F. App'x 731 (3d Cir. 2014). Accordingly, summary judgment is granted in favor of Defendants.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, we will grant Defendants' Motion for Summary Judgment.[17]

An appropriate Order follows.

---

[17]Defendants also move for summary judgment on a claim of hostile work environment. While Moss' deposition testimony references a hostile work environment, his Complaint does not contain such a cause of action and he provides no response to Defendants' argument. Accordingly, to the extent that Moss is pursuing a claim of hostile work environment, summary judgment is also granted.